05-4711-cv
SPGGC v. Blumenthal

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: May 10, 2007)                                    Decided: October 19, 2007)

Docket No.  05-4711-cv

_____

SPGGC, LLC,

*Plaintiff-Appellant*,

— v .—

RICHARD BLUMENTHAL, ATTORNEY GENERAL,

*Defendant-Appellee*.

_____

Before:        B.D. PARKER, RAGGI, AND WESLEY, *Circuit Judges*.

_____

Appeal from a judgment of the United States District Court for the District of Connecticut (Underhill, *J.*) granting Defendant-Appellee's motion to dismiss for failure to state a claim on which relief could be granted.  *See* FED. R. CIV. P. 12(b)(6).

AFFIRMED in part, VACATED in part, and REMANDED.

_____

MARGARET M. PINKHAM (Paul W. Shaw, *on the brief*),
        Brown Rudnick Berlack Israels LLP, Boston, MA,
        *for Plaintiff-Appellant*.

CLARE E. KINDALL, Assistant Attorney General (Richard Blumenthal, Attorney General, Susan Quinn Cobb, Perry Zinn Rowthorn, Jane R. Rosenberg, Assistant Attorneys General, *on the brief*), Hartford, CT, *for Defendant-Appellee.*

JULIE L. WILLIAMS, Office of the Comptroller of the Currency, Washington, D.C., *for Amicus Curiae Office of the Comptroller of the Currency.*

—————————————

BARRINGTON D. PARKER, *Circuit Judge*:

Plaintiff-Appellant SPGGC, LLC, a seller of prepaid gift cards, sued to prevent the Connecticut Attorney General from enforcing a state consumer protection law that regulates the terms and conditions of such cards. The United States District Court for the District of Connecticut (Underhill, *J.*) granted the Attorney General's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). At issue in this appeal is whether SPGGC stated valid claims for declaratory and injunctive relief on the grounds that the Attorney General's enforcement efforts are federally preempted or that they violate the Commerce Clause of the United States Constitution. We affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

Because this appeal is from the dismissal of a complaint under Rule 12(b)(6), we accept all factual allegations in the complaint as true and draw inferences in favor of SPGGC. *United States v. Baylor Univ. Med. Ctr.*, 469 F.3d 263, 267 (2d Cir. 2006).

### A. The Simon Giftcard

SPGGC is a subsidiary of Simon Property Group, Inc., which operates shopping malls in

more than thirty states, including Connecticut. The Simon Giftcard, a prepaid, stored-value payment card, is sold in Simon malls, as well as through Simon's website.

At the time SPGGC filed its Second Amended Complaint, the Giftcards were issued by Bank of America, N.A. ("BoA"), a national bank, and operated on the Visa debit card infrastructure. Simon Giftcards – which are similar in size and appearance to credit or debit cards, and carry a Visa logo along with Simon's name – are accepted by any merchants that accept Visa debit cards. SPGGC acknowledged selling "several thousands of Giftcards each year in Connecticut." All of SPGGC's revenue, and any profit, from the Giftcards derives from the fees associated with them. Several such fees are imposed directly on Giftcard purchasers, including "upfront handling/loading fees, [and] potentially applicable maintenance, replacement, and call center fees."

BoA is a Visa member bank, and as such may issue various forms of Visa payment cards. *See generally United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 332-33 (S.D.N.Y. 2001) ("*Visa I*"), *aff'd*, 344 F.3d 229 (2d Cir. 2003) ("*Visa II*"). Issuers generally act as "the liaison between the network [i.e., Visa] and the individual cardholder," and collect an interchange fee each time a transaction is executed. *Visa II*, 344 F.3d at 235. As a Visa member bank, BoA must adhere to Visa's bylaws and operating regulations. *See Visa I*, 163 F. Supp. 2d at 332. Pursuant to its relationship with SPGGC, all Simon Giftcards and cardholder agreements identified BoA as the issuer. The cards themselves were identified as property of BoA.

In addition, BoA retained review and approval authority over all terms and conditions for the Giftcards, as well as design of the cards and card carriers with which they were sold. These

terms and conditions were uniform across the United States, and, according to SPGGC, were modeled after those used for BoA's own branded gift cards. They included a $2.50 monthly service fee, to be deducted from any balance remaining on the Giftcard after six months from the date of purchase. In addition, to comply with Visa regulations, all Simon Giftcards carried a one-year expiration date. According to SPGGC's complaint, BoA approved these terms.

## B. The Connecticut Giftcard Law

The Connecticut Gift Card Law prohibits the sale of any "gift certificate" subject to inactivity or dormancy fees or to an expiration date. *See* 2003 Conn. Pub. Acts 03-1 §§ 83, 84 (June 30, 2003 Spec. Sess.) (codified at CONN. GEN. STAT. §§ 3-65c, 42-460 (2007)). Gift certificates are defined to include gift cards and other stored-value cards. CONN. GEN. STAT. § 3-56a(5).

Under the general heading "Escheats," the Gift Card Law provides that "a holder of . . . a gift certificate . . . may not impose on the property a dormancy charge or fee, abandoned property charge or fee, unclaimed property charge or fee, escheat charge or fee, inactivity charge or fee, or any similar charge, fee or penalty for inactivity with respect to the property." *Id*. § 3-65c. Elsewhere, the Law provides that "[n]o person may sell or issue a gift certificate . . . that is subject to an expiration date." *Id*. § 42-460(a).

The Attorney General maintains that the Gift Card Law applies only to the sale of gift cards in Connecticut, not their use, and thus permits cards purchased out of state to be used in Connecticut despite any restrictions or fees such cards may carry. The intent of the Law, he suggests, is to protect Connecticut consumers from being deprived unwittingly of the value of

4

gift cards they have purchased in the State.

## C.  Proceedings Below

In November 2004, the Connecticut Attorney General informed SPGGC that the State intended to bring an enforcement action against it for violating the Connecticut Gift Card Law. In response, SPGGC filed an action in federal district court seeking a declaratory judgment that the Attorney General's proposed enforcement action was preempted by the National Bank Act, 12 U.S.C. § 21 *et seq*.  Three days later, the Attorney General sued SPGGC in state court, alleging that Simon Giftcards carry expiration dates and impose on consumers a variety of fees in violation of the Gift Card Law.  SPGGC removed the Attorney General's action to federal court, where it was consolidated with the original suit.  SPGGC amended its complaint to add a claim under the Commerce Clause.  SPGGC also sought an injunction preventing the Attorney General from pursuing any further enforcement action against it in state court.

The Attorney General moved to dismiss SPGGC's complaint for failure to state a claim. Judge Underhill granted the motion.  SPGGC moved for reconsideration on three bases: (1) that the court had failed to consider our decision in *Wachovia Bank, N.A. v. Burke*, 414 F.3d 305 (2d Cir. 2005), which was issued a few weeks prior to the district court's ruling; (2) that the court had clearly erred in its analysis of SPGGC's Commerce Clause claim; and (3) that under an agreement scheduled to take effect in September 2005, the Simon Giftcard would be issued jointly by a national bank and a federal savings association, subjecting it to oversight by the Office of Thrift Supervision ("OTS") as well as the Office of the Comptroller of Currency ("OCC").  The court granted reconsideration, but adhered to its prior decision dismissing

5

SPGGC's complaint. *See SPGGC, Inc. v. Blumenthal*, 408 F. Supp. 2d 87 (D. Conn. 2006).

SPGGC appeals, arguing that the district court erroneously dismissed both its preemption and its Commerce Clause claims. SPGGC's arguments focus exclusively on its relationship with BoA – a non-party to this dispute – which has since terminated but was in effect throughout the proceedings in the district court. *Cf. SPGGC, LLC v. Ayotte*, 488 F.3d 525, 529 (1st Cir. 2007) (noting that after SPGGC ended its relationship with BoA in September 2005, it entered into contracts with U.S. Bank, a national bank, and Metabank, a national thrift, and describing the terms of those contracts). Accordingly, we will not consider the new contractual arrangements, which SPGGC raised in its motion to reconsider but which were never included in an amended complaint and were not the subject of briefing before this Court. As the Attorney General continues to seek civil penalties from SPGGC relating to its issuance of Simon Giftcards in conjunction with BoA, the issues presented herein survive the termination of SPPGC's relationship with BoA.

## DISCUSSION

We review *de novo* a district court's decision granting a motion to dismiss. *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007).

### A. Preemption

Federal preemption of a state statute can be express or implied, and generally occurs: "[1] where Congress has expressly preempted state law, [2] where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law, or [3] where federal law conflicts with state law." *Burke*, 414 F.3d at 313. "Federal

6

regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). At issue here is conflict preemption, which "occurs when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *United States v. Locke*, 529 U.S. 89, 109 (2000) (internal quotation marks omitted). SPGGC contends that applying the Connecticut Gift Card Law to Simon Giftcards would frustrate the purposes of the National Bank Act ("NBA") and OCC regulations.

The NBA authorizes national banks to exercise several enumerated powers as well as "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 Seventh. The Supreme Court has interpreted "grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996). As the agency charged with implementing the NBA and overseeing national banks in the exercise of their powers thereunder, the OCC has broad authority from Congress to prescribe rules and regulations to carry out its responsibilities. 12 U.S.C. § 93a; *see NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995). This includes the authority to define the "incidental powers" of national banks and to authorize activities beyond those enumerated in the statute. *Id*. at 258 n.2; *Burke*, 414 F.3d at 312.

One activity the OCC has authorized national banks to engage in is offering "electronic stored value systems." 12 C.F.R. § 7.5002(a)(3). Such systems include payment cards "that enable[] individual cardholders to store pre-paid value outside of a conventional consumer

7

demand deposit bank account relationship." O.C.C. Conditional Approval No. 568 (Dec. 31, 2002); *see also* O.C.C. Bull. No. 98-31, Guidance on Electronic Financial Services & Consumer Compliance FFIEC Guidance (July 30, 1998) ("Electronic stored value products are retail payment products in which value is recorded on a personal electronic device or on a magnetic strip or computer chip in exchange for a predetermined balance of funds."). It is thus beyond genuine dispute that national banks have the authority, under federal law, to develop and market gift cards that function in generally the same way as those at issue here. Moreover, OCC regulations appear to permit, or at least not to prohibit, the attachment of expiration dates and dormancy or inactivity fees to such cards. *See, e.g.*, 12 C.F.R. § 7.4002(a) (authorizing national banks to impose "non-interest charges and fees" on their customers); O.C.C. Bull. No. 96-48, Stored Value Card Systems (Sept. 10, 1996) (noting that stored value systems may have "limits on the amount of electronic cash that can be stored or cards that expire after some established time period").

Without conceding the point, the Attorney General does not dispute that as applied to a national bank, the Connecticut Gift Card Law would be preempted by the OCC's conflicting regulations regarding stored value systems. Assuming that is the case, it follows that the Gift Card Law would also be preempted as applied to national bank operating subsidiaries. 12 C.F.R. § 7.4006 ("Unless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank."); *see Watters v. Wachovia Bank, N.A.*, 127 S. Ct. 1559, 1570-71 (2007).

SPGGC is neither a national bank nor the operating subsidiary of a national bank.

8

However, SPGGC contends that because of its association with BoA, the Simon Giftcard was a national bank product and therefore subject to the OCC's exclusive supervision. The crux of SPGGC's argument is that compliance with the Connecticut Gift Card Law not only restricts its own ability to offer gift cards on terms it deems appropriate, but also limits BoA's ability to issue such cards and have them operate on Visa's electronic payment platform.

SPGGC attempts to analogize its relationship with BoA to the relationship between an operating subsidiary and its parent national bank, over which the OCC has exclusive regulatory jurisdiction. *See Watters*, 127 S. Ct. at 1572; *Burke*, 414 F.3d at 309. The district court rejected this analogy, observing that SPGGC did not plead "any facts to indicate that it is a subsidiary of a national bank, such that the NBA would apply to its activities." 408 F. Supp. 2d at 95. "At best," the court found, SPGGC had "a close agency or business relationship with [] BoA"; but that is not sufficient to entitle it to protection under the NBA. *Id*. at 94. The court acknowledged that if BoA were a plaintiff, "a different analysis might be required." *Id*. at 95.

In response to a request for amicus briefing by this Court, the OCC argued that the district court took too narrow a view of the preemption question, particularly in light of the Supreme Court's intervening decision in *Watters v. Wachovia*. *Watters*, like *Burke*, involved a state banking commissioner's effort to enforce regulations pertaining to real estate lending against a national bank operating subsidiary. *See Watters*, 127 S. Ct. at 1565-66. The Supreme Court emphasized that "in analyzing whether state law hampers the federally permitted activities of a national bank, we have focused on the exercise of a national bank's *powers*, not on its corporate structure." *Id*. at 1570 (emphasis in original). The OCC contends that the district court's

9

preemption analysis should have focused less on the identity of the plaintiff, SPGGC, than on whether and to what extent the Simon Giftcard represented an exercise of BoA's powers as a national bank.

We agree with this contention as far as it goes. However, we believe that it would be a mistake to read *Watters* so broadly as to obscure the unique role assigned to operating subsidiaries in the context of national banking regulation. The Court in *Watters* observed that unlike other types of national bank affiliates, "an operating subsidiary is tightly tied to its parent by the specification that it may engage *only* in 'the business of banking' as authorized by the Act." *Id.* at 1571-72 (emphasis added) (citations omitted). Moreover, the authority of national banks to do business through operating subsidiaries is itself a power that Congress granted to the banks through the NBA. *See id.* at 1572 ("The authority to engage in the business of mortgage lending comes from the NBA, as does the authority to conduct business through an operating subsidiary.") (citations omitted). By contrast, the relationship between BoA and SPGGC enjoys no special status under the statute. *Cf.* 12 U.S.C. §§ 24a(g)(3)(A) (distinguishing operating subsidiaries from other financial subsidiaries), 221a(b) (defining national bank "affiliates").

It is possible that, in certain instances, a national bank's decision to carry out its business through an unaffiliated third party such as SPGGC might constitute an exercise of the bank's incidental powers under the NBA, § 24 Seventh. But it does not follow that a state's attempt to regulate the *third party*'s conduct is necessarily preempted as it would be if directed toward the bank itself or toward an operating subsidiary. Significantly, the OCC does not view the regulation of SPGGC's collection of fees as an encroachment on BoA's power, stating

10

specifically in its amicus brief that "we do not believe that the state restrictions on *Simon* charging a monthly service fee in connection with the gift cards would burden or interfere with *national bank* powers to issue stored-value cards as a payment mechanism." (emphasis in the original). In any case, we must ask whether the regulation at issue actually affects the national bank's exercise of any authorized powers or whether it limits only activities of the third party which are otherwise subject to state control.

Although BoA was the issuer of the Simon Giftcard, SPGGC bore the costs of administering the program and also collected and retained maintenance and other fees associated with the cards. BoA, by contrast, was compensated exclusively through Visa interchange fees generated on a per-transaction basis. While BoA had review and approval authority over any terms and conditions the Giftcards carried, nowhere in its complaint does SPGGC allege that BoA had the authority to establish such terms or conditions in the first instance. That power belonged solely to SPGGC.

We have no difficulty concluding – as the OCC suggests in its amicus brief – that SPGGC has failed to state a valid claim for preemption of the Connecticut Gift Card Law insofar as it prohibits SPGGC from imposing inactivity and certain other fees on consumers of the Simon Giftcard. *See* CONN. GEN. STAT. § 3-65c. The Attorney General's enforcement of the Law, in this respect, does not interfere with BoA's ability to exercise its powers under the NBA and OCC regulations. Rather, it affects only the conduct of SPGGC, which is neither protected under federal law nor subject to the OCC's exclusive oversight. *Cf.* 12 U.S.C. § 481 (granting the OCC authority to examine the affairs of a national bank and its affiliates, "as shall be

11

necessary to disclose fully the relations between such bank and such affiliates and the effect of such relations upon the affairs of such bank"). We do not address whether we would reach a different conclusion were the fees in question established and collected by the issuing bank rather than by SPGGC. *See, e.g.*, *Ayotte*, 488 F.3d at 533 (holding that New Hampshire gift card regulations are preempted where U.S. Bank, the national bank that issued the cards, had "sole control" over their terms and conditions and was "solely responsible for compliance" with such terms).[1] That is not the case presently before this Court.

SPGGC, however, does state a valid claim for preemption insofar as the Connecticut Gift Card Law prohibits expiration dates. *See* CONN. GEN. STAT. § 42-460(a). Unlike the various administrative and maintenance fees associated with Simon Giftcards, SPGGC alleged in its complaint that an expiration date is necessary "to implement Visa fraud prevention and card maintenance requirements applicable to all prepaid cards bearing the VISA logo." Taking this allegation as true, an outright prohibition on expiration dates could have prevented a Visa member bank (such as BoA) from acting as the issuer of the Simon Giftcard. BoA is legally entitled to use the Visa payment network, and, contrary to the Attorney General's suggestion, a Visa issuer benefits directly from having the cards operate on the Visa network due to the interchange fees received each time a gift card transaction is executed. As a result, Connecticut's attempt to prohibit expiration dates must be analyzed separately from the State's ban on

---

[1]The First Circuit acknowledged the factual distinctions between this case and the New Hampshire case, noting that SPGGC's relationship with BoA differed from its subsequent relationship with U.S. Bank "because in the arrangement with BoA, Simon set and collected all of the fees from the sale of the giftcards and managed the giftcard program." *Ayotte*, 488 F.3d at 534. The OCC draws the same distinction in its amicus brief to this Court.

inactivity fees for purposes of federal preemption. In the absence of further factual development concerning the precise nature of Visa's requirements, as well as BoA's involvement in setting the expiration date for the Simon Giftcard, we are not at this point prepared to conclude that SPGGC's claim is entirely lacking in merit.[2] Accordingly, we vacate and remand this aspect – but only this aspect – of the judgment below so that the district court can reconsider SPGGC's preemption claim as to the state's ban on expiration dates. We express no view on the resolution of the merits of this claim.

## B. Commerce Clause

SPGGC claims that, as applied to the Simon Giftcard, the Connecticut Gift Card Law also violates the Commerce Clause of the United States Constitution. The Commerce Clause authorizes Congress "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. CONST. art. I, § 8, cl. 3. In addition, courts have "long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 127 S. Ct.

---

[2]The terms and conditions of the Simon Giftcard, attached as an exhibit to the Second Amended Complaint, indicate that cardholders could request that a new card be issued up to one year after the expiration of an older card, and any value remaining on the older card would be transferred to the new card, "minus a $7.50 reissue fee." SPGGC's complaint does not indicate that the reissue fee is part of the Visa fraud prevention and maintenance requirements or that it was required by BoA. To the extent that Connecticut were to treat such a fee as a dormancy or inactivity fee prohibited under § 3-65c – a matter which the Attorney General has not specifically addressed and as to the merits of which we express no opinion – such treatment would not be preempted for all the reasons given above. We do note that the Attorney General has taken the position in its brief that § 3-65c does not prohibit charges "such as fees to purchase and load the card, which are obvious to the consumer" and "also does not preclude the issuer from charging a fee for replacing a lost card."

1786, 1792 (2007). State laws that clearly discriminate against interstate commerce in favor of intrastate commerce are considered "virtually *per se* invalid." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 99 (1994). Discrimination, in this context, "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id*.

By contrast, we will uphold a nondiscriminatory statute that affects interstate commerce only incidentally, "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). To prove that a state law is either *per se* invalid or fails the *Pike* balancing test, a plaintiff must at least show that the law has a "disparate impact" on interstate commerce. *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 75 (2d Cir. 1998); *see also Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 218 (2d Cir. 2004).

SPGGC identifies two ways in which the Connecticut Gift Card Law allegedly impacts interstate commerce: (1) it effectively regulates commerce occurring outside of Connecticut; and (2) it conflicts with the gift card regulations of other states. Because SPGGC has failed to plead facts sufficient to support either theory, the district court properly dismissed its dormant Commerce Clause claims.

### 1. *Extraterritoriality*

A state law may burden interstate commerce when it "has the practical effect of requiring out-of-state commerce to be conducted at the regulating state's direction." *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir. 2003) (internal quotation marks omitted); *see also*

14

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 110 (2d Cir. 2001). When a statute "directly controls commerce occurring wholly outside the boundaries of a State," it is invalid under the Commerce Clause because it "exceeds the inherent limits of the enacting State's authority." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989). We have analyzed the extraterritorial effects of state regulations as a form of excessive burden under the *Pike* balancing test, *see, e.g.*, *Sorrell*, 272 F.3d at 109-10, and also as a basis for *per se* invalidity, *see, e.g.*, *Wheelabrator*, 155 F.3d at 77-78; *see also Freedom Holdings*, 357 F.3d at 216 n.11. Although it is not entirely clear from our dormant Commerce Clause precedents which test should apply in this case, it is irrelevant because – on the facts alleged by SPGGC – the Connecticut Gift Card Law does not regulate out-of-state commerce. *Cf. Am. Trucking Ass'ns v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 439 (2005) (Scalia, J., concurring); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986) (recognizing "that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach").

SPGGC attempts to analogize the Connecticut Gift Card Law to regulations the Supreme Court held unconstitutional in *Healy v. Beer Institute* and *Brown-Forman Distillers v. New York State Liquor Authority*. *Healy* and *Brown-Forman* both concerned state laws that pegged the in-state prices of liquor or beer to prices charged outside the states in question. *See Healy*, 491 U.S. at 326-27 (describing Connecticut's beer price-affirmation statute); *Brown-Forman*, 476 U.S. at 575-76 (describing New York's Alcoholic Beverage Control Law). Although the statutes at issue in those two cases differed somewhat in operation, each had "the undeniable effect of controlling

15

commercial activity occurring wholly outside the boundary of the State." *Healy*, 491 U.S. at 337.

In *Brown-Forman*, the Court found that New York had "project[ed] its legislation into other

States" by effectively requiring distillers to seek the approval of the New York State Liquor

Authority before lowering prices elsewhere. 476 U.S. at 583-84 (internal quotation marks

omitted). Likewise, in *Healy*, the Court observed that Connecticut had "require[d] out-of-state

shippers to forgo the implementation of competitive-pricing schemes in out-of-state markets

because those pricing decisions are imported by statute into the Connecticut market regardless of

local competitive conditions." 491 U.S. at 339. Holding both statutes unconstitutional, the

Court noted that "States may not deprive businesses and consumers in other States of 'whatever

competitive advantages they may possess' based on the conditions of the local market." *Id*.

(quoting *Brown-Forman*, 476 U.S. at 580). SPGGC suggests that the Gift Card Law, like the

liquor and beer price regulations, benefits Connecticut consumers at the expense of consumers in

other states.

None of the factual allegations in SPGGC's complaint support its bald assertion that the

Gift Card Law operates as a form of economic protectionism in favor of Connecticut consumers.[3]

*Cf. Brown-Forman*, 476 U.S. at 580. Were we to accept SPGGC's theory, almost every state

---

[3]In its complaint, SPGGC also asserts that "Connecticut has singled out a product developed and marketed outside of Connecticut upon which to seek to impose . . . massive costs." This argument does not appear in SPGGC's brief, and, in any event, is not supported by the factual allegations. On its face, the Connecticut statute applies equally to all sellers of gift cards regardless of where they are located, and SPGGC provides no basis to assume that its application is different in practice. Moreover, "[t]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 88 (1987) (internal quotation marks omitted).

16

consumer protection law would be considered "protectionist" in a sense prohibited by the Constitution. The meaning of the dormant Commerce Clause is far narrower. *See United Haulers*, 127 S. Ct. at 1796 ("The dormant Commerce Clause is not a roving license for federal courts to decide what activities are appropriate for state and local government to undertake, and what activities must be the province of private market competition."). And because consumer protection is a field traditionally subject to state regulation, "[w]e should be particularly hesitant to interfere with the [State's] efforts under the guise of the Commerce Clause." *Id*.; *see Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41 (2d Cir. 1990).

SPGGC fails to allege any facts tending to show, specifically, how the effects of the Gift Card Law might be projected into other states. The Attorney General has stipulated that the law applies only to sales of gift cards in Connecticut. Unlike the price-affirmation laws in *Healy* and *Brown-Forman*, the Gift Card Law does not, by its terms or its effects, directly regulate sales of gift cards in other states. Nor does it prevent other states from regulating gift card sales differently within their own territories.

SPGGC argues that the Gift Card Law nonetheless operates as an extraterritorial restriction because it forces the costs of compliance onto out-of-state consumers. We do not agree that out-of-state consumers must inevitably be the ones to bear such costs. Instead, they could be passed on to Connecticut gift card consumers in the form of non-prohibited fees or else absorbed by SPGGC in the form of lower profits. In *Sorrell*, we rejected an argument virtually identical to the one SPGGC makes here. We observed that simply because a state regulation would force the regulated manufacturers to bear some of its costs, it does not automatically

17

violate the Commerce Clause.  *Sorrell*, 272 F.3d at 111.

SPGGC further argues that because Visa generally requires that payment cards carry an expiration date to operate on its network, the Gift Card Law would effectively ban Visa products in Connecticut and thereby impact the worldwide market for electronic payment instruments. This argument is significantly overstated.  Even if the expiration date provisions of the Gift Card Law are not preempted as applied to the Simon Gift Card – a matter which the district court must consider on remand – the Law would not prohibit all Visa products from being sold (or used) in Connecticut.  It would prohibit only the sale of gift cards subject to expiration dates, and even then would apply only to sellers who are not national banks.  The fact that some of those sellers might be companies that operate nationally or globally does not, on its own, establish a dormant Commerce Clause violation.  *See CTS Corp.*, 481 U.S. at 88.

Finally, SPGGC contends that insofar as the Connecticut Gift Card Law applies to gift cards sold via the Internet, it is inherently extraterritorial.  In this regard, SPGGC relies heavily on *American Booksellers v. Dean*, where we commented in dicta that the Internet might "soon be seen as falling within the class of subjects that are protected from State regulation because they imperatively demand a single uniform rule."  342 F.3d at 104 (internal quotation marks and alterations omitted).  *Dean* concerned a Vermont law prohibiting the distribution of indecent material to minors.  In response to a challenge brought by the operators of websites containing sexually explicit material, we held that the law violated the First Amendment as well as the dormant Commerce Clause.  Central to our decision was the district court's finding that then-current technology made it "difficult for 'publishers' who post information on the internet to

18

limit website access to adult viewers or to viewers from certain states." *Id*. at 99. Because a person outside Vermont could not effectively prevent persons inside Vermont from accessing material posted on a website, out-of-state publishers were forced to comply with the Vermont statute or risk prosecution. *See id*. at 103. We therefore concluded that Vermont had projected its regulation onto the rest of the nation. *Id*.

In contrast to Internet publishers affected by the Vermont statute, SPGGC has readily available a near-perfect means of distinguishing between online consumers of the Simon Giftcard who reside in Connecticut and those who reside elsewhere – their credit card billing addresses. In *Dean*, we were concerned that visitors to websites featuring sexually explicit content might be forced to "forgo the anonymity otherwise available on the internet" if required to submit to an age-verification system. *Id.* at 99. But online gift card buyers, who must supply some form of payment information in order to complete a transaction, have no clear expectation of or interest in remaining anonymous. As a result, the analogy SPGGC urges us to draw between this case and *Dean* collapses.

The fact that an ordinary commercial transaction happens to occur in cyberspace does not insulate it from otherwise applicable state consumer protection laws. Accordingly, SPGGC does not state a valid claim for relief under the dormant Commerce Clause simply because it conducts business over the Internet. Based on the facts alleged, we see no risk that the Connecticut Gift Card Law will control sales of gift cards to anyone other than Connecticut consumers, whether such sales occur in person or online.

## 2. *Interstate Conflicts*

SPGGC also argues that the Connecticut statute burdens interstate commerce because it conflicts with the laws of other states that regulate gift cards differently. In a series of cases dealing with state regulation of highway and railway transportation, the Supreme Court recognized that the existence of substantial regulatory conflicts between states may itself disproportionately burden interstate commerce. *See Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 445-46 (1978); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529-30 (1959); *S. Pac. Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 775 (1945); *see also Sorrell*, 272 F.3d at 112.

In *Bibb*, the Court considered an Illinois statute that required the use of a certain type of mudguard on trucks and trailers that traversed the State's highways. 359 U.S. at 521-22. The statute prohibited the conventional mudguards that were legal in forty-five other states and that one other state, Arkansas, affirmatively required – "render[ing] the use of the same motor vehicle equipment in both [Illinois and Arkansas] impossible." *Id*. at 523. Thus, to move cargo from Arkansas to Illinois a carrier would have to either change vehicles or swap mudguards, causing significant delay. *Id*. at 526-27. The Illinois statute would also "seriously interfere[] with the 'interline' operations of motor carriers." *Id*. at 527. Although the statute was "nondiscriminatory," the Court concluded that it excessively burdened interstate commerce. *Id*. at 529. The Court emphasized that it had not established a rule of *per se* illegality in this context, but that "[a] State which insists on a design out of line with the requirements of almost all the other States may sometimes place a great burden of delay and inconvenience on those interstate motor carriers entering or crossing its territory." *Id*. at 529-30.

20

SPGGC contends that a similar burden would result from the collective operation of various state laws that regulate gift cards inconsistently. Because SPGGC sells its gift cards in multiple states, and because the cards themselves may sometimes travel across state lines, SPGGC suggests that regulation of gift cards, like regulation of mudguards, "is not one of those matters 'admitting of diversity of treatment, according to the special requirements of local conditions.'" *Id*. at 529 (quoting *Sproles v. Binford*, 286 U.S. 374, 390 (1932)).

While SPGGC offers several examples of states that regulate gift cards differently from Connecticut, it has not identified any actual conflict of the sort at issue in *Bibb*. *See Sorrell*, 272 F.3d at 112 ("[T]here must be an actual conflict between the challenged regulation and those in place in other states."); *see also C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 406-07 (1994) (O'Connor, J., concurring). Specifically, SPGGC has failed to identify any state, including Connecticut, that regulates gift cards in a way that would impede the interstate movement of gift cards subject to different terms and conditions. That SPGGC may not be able to sell its gift cards on exactly the same terms to consumers in all states does not, in itself, demonstrate a regulatory conflict sufficient to establish that Connecticut's law is unconstitutional. Consumer protection matters are typically left to the control of the states precisely so that different states *can* apply different regulatory standards based on what is locally appropriate. This Court may "not sit as a superlegislature to determine the wisdom, need, and propriety of laws that touch economic problems, business affairs, or social conditions." *Paris Adult Theater I v. Slaton*, 413 U.S. 49, 64 (1973) (internal quotation marks omitted).

It is clear from the facts alleged that the only real burden resulting from disparate state

21

regulation of the Simon Giftcard is the burden of compliance that falls on SPGGC itself. That is not a sufficient basis on which to establish a dormant Commerce Clause claim where the state law at issue does not otherwise interfere with interstate commerce.

## CONCLUSION

For the foregoing reasons, we AFFIRM in part and VACATE in part the district court's judgment, and REMAND the case for further proceedings consistent with this opinion.