■ In the Matter of NEW YORK STATE DIVISION OF HUMAN RIGHTS, Respondent, v H&R BLOCK TAX SERVICES, INC., et al., Appellants. [897 NYS2d 75]—

Order, Supreme Court, Bronx County (Betty Owen Stinson, J.), entered on or about March 20, 2008, which granted petitioner's motion to compel respondents to comply with a subpoena duces tecum dated April 9, 2007 and directed respondents to produce the specified documents no later than 15 days after service of the order with notice of entry, and denied respondents' cross motion to quash the subpoena, affirmed, with costs.

In 2007, petitioner, New York State Division of Human Rights (DHR), served respondents with a subpoena seeking information related to the issuance or promotion, targeted at minorities and military families, of short-term "Pay Stub," "Holiday" or "Refund Anticipation" loans (collectively, RALs) collateralized by an imminent paycheck or an anticipated tax refund. The in-

formation sought included (1) a list of respondents' branches and franchises in New York issuing or promoting RALs for the last three years, (2) the number issued from each location, (3) a list of the outlets for advertisements (such as newspapers, radio and billboards), and (4) the marketing plans for the loan products.

Executive Law § 296-a (1) (b) provides that it shall be an unlawful discriminatory practice for "any creditor or any officer, agent or employee thereof" to "discriminate in the granting, withholding, extending or renewing, or in the fixing of the rates, terms or conditions of, any form of credit, on the basis of race, creed, color, national origin, sexual orientation, [or] military status." DHR is empowered "[u]pon its own motion, to test and investigate and to make, sign and file complaints alleging violations of this article and to initiate investigations and studies to carry out the purposes of this article" (Executive Law § 295 [6] [b]). DHR is also empowered to "require the production for examination of any books or papers relating to any matter under investigation or in question before [it]," to issue subpoenas "at any stage of any investigation or proceeding before it" (Executive Law § 295 [7]), and to "inquire into incidents of and conditions which may lead to tension and conflict among racial, religious and nationality groups and to take such action within the authority granted by law . . . as may be designed to alleviate such conditions, tension and conflict" (Executive Law § 295 [11]). DHR's regulations further provide that "[t]he commissioner, . . . or other officer or employee of the division designated for this purpose by the commissioner, may issue subpoenas *duces tecum* to require the production for examination of any books, payrolls, personnel records, correspondence, documents, papers or any other evidence relating to any matter under investigation or in question before the division" (9 NYCRR 465.14 [a] [2]). Pursuant to this authority, DHR's subpoena powers exist not only in conjunction with the filing of a complaint, but also in connection with DHR's power to conduct a general, informational investigation (*see Matter of Broido v State Commn. for Human Rights,* 40 Misc 2d 419 [1963]).

In rejecting respondents' argument that there was no minimum factual basis for the issuance of a subpoena because none of the respondents was a "creditor" within the meaning of Executive Law § 296-a, the motion court observed in part that the statute also covers any "officer, agent or employee of a creditor as well" and that "H&R Block [referring to respondents collectively] has specifically identified itself as an 'agent' of HSBC

[HSBC Bank USA, National Association] for the purpose of offering RALs and is therefore covered by § 296-a." Respondents claim that they are not agents of HSBC because they did not market, offer or issue RALs. In this regard, respondents contend that although respondent H&R Block Tax Services, Inc. (Tax Services) is a party to the HSBC retail settlement products distribution agreement dated as of September 23, 2005, it is named in its capacity as franchisor of independently owned "H&R Block" franchise offices, not as an agent of HSBC for the RAL program, and that it is the independent franchisees that were appointed as HSBC's agents for distributing RALs.

Contrary to respondents' claims, there is sufficient evidence in the record to establish an agency relationship between HSBC and Tax Services for the purpose of facilitating or arranging the RAL program. True, the agreement states in its recitals that Tax Services is "the franchisor of Block Franchise Offices throughout the United States" and that HSBC desires to engage "each Franchisee as its agent to distribute Retail Settlement Products through Block offices." However, the agreement requires Tax Services to "use commercially reasonable efforts to cause their respective Franchisees to offer Retail Settlement Products through the Block Franchisee Offices" (art II, § 2.1 [i]; art V, § 5.8) and to "provide the means for each of their respective Franchisees to agree to be bound by the terms of its Franchisee Distribution Agreement" (art V, § 5.8). The agreement further provides that HSBC and Tax Services "shall enter into one or more Franchisee Distribution Agreements with each applicable Franchisee" (art II, § 2.2 [b]), that HSBC and Tax Services "shall enter into the Indemnification Agreement" (art II, § 2.2 [e]) and that "Franchisors" "shall incorporate within the Block Franchisee Policies and Procedures applicable to the Franchisees, Settlement Product Programs and Procedures substantially similar to those applicable to the Block Agents under this Retail Distribution Agreement with respect to the offering of Settlement products . . . and as HSBC may reasonably request" (art V, § 5.10). By these provisions, Tax Services, acting at the behest of HSBC, compels its franchises to market the RALs in accordance with HSBC's policies and procedures, which suffices to deem Tax Services an agent of HSBC for the purpose of arranging and facilitating the RAL program.

In any event, even if we found that Tax Services or any other of the respondents was not an agent of HSBC with respect to the sale or marketing of RALs, that finding would not mandate that the subpoenas be quashed. When DHR is conducting an investigation into potential violations of Executive Law § 296-a,

the reach of its subpoenas is not limited to persons or entities that are creditors or officers, agents or employees of a creditor (*cf. Matter of New York Republican State Comm. v New York State Commn. on Govt. Integrity*, 138 Misc 2d 790, 794-795 [1988], *affd* 140 AD2d 1014 [1988], *lv denied* 72 NY2d 803 [1988]). Accordingly, if a factual basis exists, DHR is entitled to issue subpoenas seeking documents from respondents that are relevant to its investigation, without regard to whether respondents are agents of HSBC. Here, independent reports containing extensive and detailed information about the marketing and targeting of the RALs to minorities or military families provide the requisite factual support for petitioner's exercise of its power, on its own motion, to investigate possible violations of the Human Rights Law by H&R Block entities and, in conjunction therewith, to issue subpoenas to any entity possessing materials relevant to its investigation (*see* Executive Law § 295 [6] [b]; [7]; 9 NYCRR 465.14 [a] [2]; *New York State Div. of Human Rights v Nationwide Mut. Ins. Co.*, 74 AD2d 16, 20 [1980], *affd* 53 NY2d 1008 [1981]).

Furthermore, whether or not respondents are agents, under the circumstances before us petitioner's investigation into the marketing of the RALs would not be preempted by federal law.

The National Bank Act (NBA) (12 USC § 21 *et seq.*) grants national banks the authority to exercise certain enumerated powers and "all such incidental powers as shall be necessary to carry on the business of banking" (12 USC § 24 [Seventh]). Congress has authorized the Office of the Comptroller of the Currency (OCC) to oversee the operations of national banks and to define these "incidental powers" (12 USC § 93a; *see NationsBank of N. C., N. A. v Variable Annuity Life Ins. Co.*, 513 US 251, 256, 258 [1995]). "[W]hen state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way" (*Watters v Wachovia Bank, N. A.*, 550 US 1, 12, 13-15 [2007] [whether it was federal bank or its operating subsidiary that performed mortgage activity, state laws as to licensing, reporting and visitation were preempted because they would interfere with the bank's federally authorized business]).

As noted in the concurring opinion, if respondents are not agents of HSBC with respect to the RALs, there would be no preemption under the NBA. On the other hand, if Tax Services, or any other respondent, is deemed an agent of HSBC in connection with the RAL program, *Watters* instructs that the proper preemption analysis focus on the activity being regulated rather than the actor who is being regulated (*Watters*, 550 US at 18

["in analyzing whether state law hampers the federally permitted activities of a national bank, we have focused on the exercise of a national bank's *powers*, not on its corporate structure"]).

In performing this analysis, we first note that NBA and OCC regulations do not preempt the field of national bank regulation (*see e.g. First Nat. Bank in St. Louis v Missouri*, 263 US 640, 656 [1924]). Rather, when Congress enacted the NBA, it created a "mixed state/federal regime[ ] in which the Federal Government exercises general oversight while leaving state substantive law in place" (*Cuomo v Clearing House Assn., L. L. C.*, 557 US —, —, 129 S Ct 2710, 2718 [2009]). "[N]ational banks are subject to the laws of a state in respect of their affairs unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as federal agencies or conflict with the paramount law of the United States" (*First Nat. Bank in St. Louis*, 263 US at 656). Accordingly, "[s]tates are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers" (*Watters*, 550 US at 12; *cf. General Motors Corp. v Abrams*, 897 F2d 34, 41-42 [2d Cir 1990] ["(b)ecause consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area"]). Thus, we must consider whether DHR's subpoenas affect HSBC's exercise of any authorized.powers or whether it limits only activities of a third party that are otherwise subject to state regulation.

Here, DHR is not investigating HSBC's conduct and the investigation would not affect HSBC's ability or discretion to originate RALs. Rather, DHR is investigating whether marketing practices with respect to the RALs violate the State's Human Rights Law (*see SPGGC, LLC v Blumenthal*, 505 F3d 183, 191 [2007] [Connecticut gift-card law not preempted by federal law by its prohibition of seller's in-state sales of gift cards since enforcement did not interfere with bank's ability to develop and market gift cards, but interfered only with conduct of seller who bore costs of administering program, collected fees and established terms and conditions of gift cards]; *Carson v H & R Block, Inc.*, 250 F Supp 2d 669, 674-675 [SD Miss 2003] [court rejected non-bank defendant's preemption argument because statute at issue did not prohibit banking activity, but rather prohibited third-party agent from misrepresenting bank products it was selling]). At most, the subpoenas "incidentally affect" the exercise of a bank's powers (*see e.g. Jefferson v Chase Home Fin.*, 2008 WL 1883484, *12-14, 2008 US Dist LEXIS

101031, *36-42 [ND Cal 2008] [general consumer protection laws not preempted by NBA or OCC regulations on claims against a national bank that it misrepresented how it would apply prepayments]; *Baldanzi v WFC Holdings Corp.*, 2008 WL 4924987, *2, 2008 US Dist LEXIS 95727, *5-7 [SD NY 2008] [stating that "(i)n contrast to findings of federal preemption in cases involving specific state regulations that conflict with the NBA, causes of action sounding in contract, consumer protection statutes and tort have repeatedly been found by federal courts not to be preempted," and holding that claim that national bank violated general consumer protection statute when it charged interest accrued for one or more days after principal balance on the loan had been paid was not preempted by the NBA or OCC regulations]; *Young v Wells Fargo & Co.*, 671 F Supp 2d 1006, 1019-1022 [SD Iowa 2009] [claims brought under state consumer protection statutes alleging that the national bank defrauded customers by using a computer system that was programmed to automatically charge as many property inspection fees as possible irrespective of their reasonableness held not preempted]; *Mwantembe v TD Bank, N.A.*, 669 F Supp 2d 545 [ED Pa 2009] [holding that state law claims of fraud regarding gift cards issued by national banks are not preempted by the NBA because gift cards are not specifically authorized by the OCC]; *Mann v TD Bank, N.A.*, 2009 WL 3818128, *5, 2009 US Dist LEXIS 106015, *13 [D NJ 2009] ["the state laws at issue in this case (regarding fraud under the New Jersey Consumer Fraud Act) do not prohibit Defendants from conducting a discreet banking activity. Rather, the state laws at issue prohibit Defendants from conducting a discreet banking activity in a certain manner"]).

Accordingly, given that respondents have not articulated, and we cannot discern, how enforcement of the Human Rights Law would prevent or significantly interfere with HSBC's ability to engage in the banking activity of issuing RALs, there is no preemption and respondents must comply with the subpoena, even if Tax Services, or any other respondent, is deemed an agent of HSBC in connection with the RAL program. Concur—Andrias, J.P., Nardelli, Moskowitz and Renwick, JJ.

McGuire, J., concurs in a separate memorandum as follows: I agree with the majority that respondents' challenges to the subpoena under New York law (i.e., Executive Law § 296-a) are unavailing because the reach of petitioner's subpoena power "is not limited to persons or entities that are creditors or officers, agents or employees of a creditor" and because there is ample factual support for the exercise of this power. I further agree

that the subpoena should be upheld with respect to each of the respondents. I do not agree, however, with the majority's discussion of the preemption issue as it pertains to one of the respondents.

Respondents argue that "[i]f a state law improperly impairs, obstructs, or conditions the 'business of banking' conducted by a national bank, then it will be preempted, regardless of the manner in which the national bank determines to conduct that business, whether through its own employees, subsidiaries, or agents." In addition, respondents advance the distinct contention that the exclusive agent of a national bank can invoke federal preemption under the National Bank Act (NBA). In this regard, respondents rely, inter alia, on *Watters v Wachovia Bank, N. A.* (550 US 1 [2007] [holding that operating subsidiaries of national banks are entitled to the same immunity from state visitation as the national banks]).

To the extent respondents' challenge to the subpoena on preemption grounds is based on the contention that petitioner cannot enforce generally applicable New York laws relating to the extension of credit against either the national bank that issued the short-term "Pay Stub," "Holiday" or "Refund Anticipation" loans (collectively, RALs) or its agents for the purpose of the RAL program, that contention is refuted by the Supreme Court's recent decision in *Cuomo v Clearing House Assn., L. L. C.* (557 US —, —, 129 S Ct 2710, 2721 [2009]). In *Clearing House*, however, the Supreme Court also held that the issuance of an executive subpoena by the New York State Attorney General to a national bank would entail the exercise of "visitorial powers" that the NBA forbids the states from exercising (557 US at —, 129 S Ct at 2721-2722). Thus, respondents' challenge to the subpoena is bolstered by *Clearing House* to the extent they are correct that an agent of a national bank, like a subsidiary of a national bank, can assert the rights of the national bank under the NBA.

However, respondents repeatedly state both in their main brief and their reply brief that, for the purpose of the RAL program, they are *not* agents of the national bank that extended the RALs at issue. I agree and would reject their preemption argument for this reason. The fact that certain other H&R Block entities and independent franchisees not named in the subpoena are such agents is of no moment as the business relationship between respondents and those agents is insufficient to entitle respondents to the protections of the NBA (*see SPGGC, LLC v Blumenthal*, 505 F3d 183, 190 [2d Cir 2007]; *cf. County Court of Ulster Cty. v Allen*, 442 US 140, 155 [1979]).

The majority agrees with respondents that respondents H&R Block Tax and Business Services, Inc. and H&R Block Mortgage Corporation are not agents of the national bank for the purpose of the RAL program. Although I agree that neither of these two respondents are such agents, I disagree with the majority's conclusion that respondent H&R Block Tax Services, Inc. is such an agent of the national bank. The distribution agreement the majority relies on simply does not establish that respondents are wrong and Tax Services is an agent of the national bank for the purpose of the RAL program (*see generally New York Mar. & Gen. Ins. Co. v Tradeline [L.L.C.]*, 266 F3d 112, 122 [2d Cir 2001] [under "New York common law . . . (,) an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act" (internal quotation marks omitted)]). Moreover, the mere fact that Tax Services is a franchisor of other H&R Block entities is not sufficient to establish that it is an agent of the franchisees (*Terrano v Fine*, 17 AD3d 449 [2d Dept 2005]).

In any event, I would regard the concession by Tax Services that it is not an agent of the federal bank for purposes of the RAL program as fatal to respondents' preemption argument. After all, the status of Tax Services as such an agent is a necessary condition to quashing the subpoena on preemption grounds. However, the majority holds that "there is no preemption and respondents must comply with the subpoena, even if Tax Services, or any other respondent, is deemed an agent of HSBC in connection with the RAL program." That is so, according to the majority, because petitioner "is not investigating HSBC's conduct . . . [but] whether marketing practices with respect to the RALs violate the State's Human Rights Law."

Under the majority's analysis, petitioner could issue an executive subpoena to the national bank requiring it to produce all of its documents relating to the marketing of the RALs. The same rationale the majority employs here—the investigation into marketing practices with respect to the RALs "would not affect [the national bank's] ability or discretion to originate RALs"—would apply to such a subpoena. Although I need not decide the point, it is difficult to see how the subpoena could be upheld consistently with the provisions of federal law specifying that, with exceptions not relevant here, national banks are not subject to visitorial powers (*see* 12 USC § 484 [a]; 12 CFR 7.4000 [a]). The prohibited visitorial powers include the issuance of an executive subpoena requiring production of the bank's records, and nothing in the statute or the regulation—or, for that mat-

ter, in *Clearing House*—suggests that the prohibition turns on a nicety such as whether the subpoena or other visitorial power would incidentally or significantly affect the exercise of the bank's powers. None of the decisions of the district courts cited by the majority support its position that the subpoena is enforceable even if Tax Services is an agent of the national bank entitled to the same immunity from state visitation as the national bank. Two final points: first, the subpoena is not limited to records relating to the marketing of the loans; second, the marketing of the loans is hardly unrelated to the terms of the loans, as petitioner of course is not investigating the marketing of the loans because of its high regard for their terms.