[893 NYS2d 438]

AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.,
Plaintiff, v TITUS ASSIH, Defendant.

Civil Court of the City of New York, Richmond County, December 7, 2009

### APPEARANCES OF COUNSEL

*Mitchell Norman Kay*, New York City, for plaintiff. *Titus Assih*, defendant pro se.

### OPINION OF THE COURT

PHILIP S. STRANIERE, J.

Plaintiff, American Express Travel Related Services Company, Inc., commenced this action against the defendant, Titus Assih, alleging that the defendant failed to pay credit card charges incurred. A trial was held on November 10, 2009. Plaintiff was represented by counsel. Defendant appeared without an attorney.

Plaintiff's witness testified that the defendant was the holder of an American Express credit card. Beginning in December 2006 defendant began to utilize the card and charge items. Monthly payments as required by the card agreement were made until October 2007. At that time plaintiff alleges the defendant failed to make the minimum payment due which triggered an increase in the interest rate from 12.24% initially to 20.74% and then to 27.79% as well as a late payment charge on the November 5, 2007 bill. The defendant then continued to make small monthly payments in amounts less than the required minimum and ceased making any payments as of January 2008. The defendant asserts that he was not late with any payment when the plaintiff unilaterally and without notice raised the interest rate, so therefore, there was no basis for

American Express to have done so. Unable to resolve the dispute with the plaintiff, the defendant ceased making any payments. Interestingly, during the brief period this credit card was in effect prior to the alleged breach, plaintiff had determined that defendant's initial payment history warranted increasing his credit line from $12,500 to $14,500 in July 2007.

Having dealt with thousands of consumer credit cases over the years, the court is sometimes caused to wonder if the regulations governing this industry originated in the Wonderful Land of Oz[1] and not in the legislatures of the various states and national government. For example, the scene where Dorothy and friends approach the gates of the Emerald City and ring the bell seeking entrance seems to present a number of the issues arising in debt collection litigation.

> "GUARDIAN OF THE EMERALD CITY GATES: Who rang that bell?
>
> "DOROTHY, SCARECROW, COWARDLY LION, TIN WOODS-MAN: (together) We did!
>
> "GUARDIAN: Can't you read?
>
> "SCARECROW: Read what?
>
> "GUARDIAN: The notice!
>
> "DOROTHY: What notice?
>
> "GUARDIAN: It's on the door—as plain as the nose on my face it . . . oh
>
> "(Guardian realizing there is no notice posted goes inside, gets a sign and hangs it on the door. The notice states: Bell out of order, please knock.)"

As set forth below, consumers such as the defendant, like Dorothy and friends, are being charged with notice of the terms and conditions of an agreement whether or not they actually have knowledge of the agreement. The scene in The Wizard of Oz continues as Dorothy and friends read the notice and dutifully knock.

> "GUARDIAN: Well, that's more like it! Now state your business!
>
> "DOROTHY AND FRIENDS: We want to see the Wizard!
>
> "GUARDIAN: The Wizard? But nobody can see the Great Oz! Nobody's ever seen the Great Oz! Even I've never seen him!

---

1. The Wizard of Oz was written in 1900 by L. Frank Baum. The script for the 1939 movie was primarily by Noel Langley, Florence Ryerson and Edgar Allan Woolf.

"DOROTHY: Well, then how do you know there is one?"

Like the Land of Oz, run by a Wizard whom no one has ever seen, the Land of Credit Cards permits consumers to be bound by agreements they never sign—agreements they may have never received—subject to change without notice and the laws of a state other than those existing where they reside.

Issues Presented

A. <u>Is There an Agreement between the Parties?</u>

■ Plaintiff has submitted into evidence what purport to be duplicate copies of all of the monthly statements issued to defendant over the period January 4, 2007 to April 6, 2008. Plaintiff has also presented a document labeled "Agreement Between American Express Credit Cardmember and American Express Centurion Bank" which the plaintiff alleges was the agreement in effect between the plaintiff and defendant during the entire period in question. The agreement does not contain a spot for the signature of the plaintiff, although a preprinted signature from the president/CEO of the bank is included in the document. The document is undated except for the numbers "666631 1/3/03 3:28 PM" at the top of each of eight pages. The last page indicates a copyright of "2003 American Express." There is no evidence of an application being submitted to the plaintiff by the defendant, either in writing, on line, or by any other method. There is no way to determine what representations were made by American Express to induce the defendant to apply for a credit card and whether the contents of the "Agreement" in any way reflect the understanding of the defendant at the time of the application.

Who exactly is the plaintiff? The caption states it is "American Express Travel Related Services Company, Inc." (Travel); the monthly statements are from "American Express" (Card)—the same entity to which payments are to be made; and the alleged "Agreement" is with "American Express Centurion Bank" (Bank). Apparently, American Express Centurion Bank is a one-branch (or no-branch nonbank) bank located in Utah. Plaintiff has not established how defendant entered into an agreement with Bank when all of his dealings were with Card. The monthly payments are mailed by defendant to Card at a New York City post office box. There is no mention on the monthly statement sent by Card of the existence of either Bank or Travel, or any indication of the involvement of either Bank or Travel in the transaction, yet defendant is allegedly bound by an agreement with Bank and is being sued by Travel.

Interestingly, the first paragraph of the "Agreement" provides:

"Welcome to American Express Cardmembership.

"Please read this Agreement thoroughly, because when you keep, sign or use the American Express Credit Card issued to you, including any renewal or replacement Cards issued to you (hereafter referred to as the 'Card'), you agree to the terms of this Agreement."

This means that when a consumer applies for what that person believes to be an "American Express Credit Card," the consumer is in reality entering into an "Agreement" with American Express Centurion Bank. The court must question if this information is divulged to the consumer at the time of the application. When is the "Agreement" sent to the consumer? Is it provided when the credit card is issued or with the first monthly statement sent after the credit card is used? There is no evidence of when the "Agreement" was mailed to the defendant. In any case, the "Agreement" does not explain how Travel became the plaintiff in this action. An examination of the American Express credit card does not disclose the name of either Travel or Bank. Is it possible this switch of names was achieved in the same manner Dorothy got from Kansas to Munchkinland—by being taken by a tornado over the rainbow?

Perhaps American Express Travel is doing business under the assumed name of "American Express." If this is the case, then Travel was required to comply with General Business Law § 130 which mandates corporations to file a certificate of doing business under an assumed name with the Secretary of State (General Business Law § 130 [2]). This information was not pleaded in the complaint. The failure to comply with this filing requirement prevents an entity from maintaining an action except in its own name (General Business Law § 130 [9]). If plaintiff alleges that it is in compliance with the statute because it brought the action in the corporate name of Travel, then the failure to notify the cardholder of its correct legal name in the billings or card agreement might amount to a deceptive business practice under General Business Law § 349.

Like the Wizard in The Wizard of Oz, who asked that Dorothy and friends "[p]ay no attention to that man behind the curtain," plaintiff would have the court ignore the plain evidence of this case that plaintiff has failed to establish that Travel is the proper party to bring the action.

B. Is the Agreement Submitted the One Which is in Effect?

The monthly statements of defendant's account submitted by plaintiff list the annual percentage rate (APR) at the time of the opening of the account as "12.24%" for "purchases" and "23.32%" for "cash advances." Those rates on the final statement submitted are set forth at "27.99%" for both "purchases" and "cash advances."

On page one of the "Agreement," which plaintiff alleges is applicable to the defendant, there is a section labeled "Calculation of Daily Periodic Rate." It provides in paragraphs C and D that the APR for cash advances is the prime rate plus "14.99%" while the APR for purchases will be a fixed rate of "17.99%." The document in that same section fixes the default rate for both purchases and cash advances at "23.99%." A review of the APR charged on each of the monthly statements provided by plaintiff shows that the rates set forth in the "Agreement" were never assessed against this account. Defendant's account had an initial APR for "purchases" of "12.24%" and for "cash advances" of "23.24%." It should be pointed out that the cash advance rate is irrelevant to the litigation as it is conceded that the defendant did not utilize the cash advance feature of the account. Plaintiff alleges that after the defendant failed to make a minimum payment due in October 2007 the APR went to "20.74%" for "purchases" and "22.74%" for "cash advances." These changes are reflected in the November 2007 bill. The December 2007 bill had the APR at "29.94%" for both categories. While in February 2008 the APR on each was "29.49%" and in March it was "27.99%."

At no time during the period in question was defendant ever subjected to the APR rate disclosed in the alleged "Agreement." If there was a change in the terms of the "Agreement," then plaintiff has failed to provide proof that defendant was given such notification. The "Agreement" in the section "Calculation of Daily Periodic Rate" at paragraph A provides: "The Daily Periodic Rate for charges each month depends on your adherence to the terms of this Agreement during the 12-month period ending with the Closing Date of the current billing period (the 'Review Period')."

The November 2007 statement assessed a "late payment fee" of "$38.00." The "Agreement" at the section "Delinquency Fees" has the fee set at "$35.00" if the unpaid balance exceeded $1,000 as it did here. That fee remained on the defendant's bill each month thereafter. The section of the "Agreement" labeled

"Fees" in paragraph five provides for an "Over the Limit Fee" of "$29.00 in each billing period if a balance on your Account exceeds your credit limit." The statements submitted into evidence show an "over the limit fee" of "$35.00" being assessed on defendant's account.

The court notes that there were some amendments to the cardholder agreement submitted as part of the plaintiff's exhibits, but none of those amendments affected the APR or the "fees" being charged. Remarkably, each of these amendments contains the following statement: "These changes become effective on the dates indicated below, *whether or not you receive a billing statement*" (emphasis added). Incredibly, plaintiff is asserting that the "Agreement" may be amended without providing any notice to the cardholder. This is but another example of the credit card industry applying the "Mammy Yokum—I has spoken" rule to its dealings with consumers.[2] Although the print on the "Agreement" is rather small, the court was not able to locate the "divination" paragraph applicable to cardholders.

Clearly, unless the court is, like the Cowardly Lion, "a victim of disorganized thinking," it must be concluded that the "Agreement" submitted by the plaintiff was not the "Agreement" which was applicable when the defendant became a cardholder of American Express. Nor was it the "Agreement" in effect during the period in question—there is no other explanation for the differences between the rates and fees charged by plaintiff and those disclosed in the "Agreement" submitted at trial.

Plaintiff has failed to prove the terms of the "Agreement" between the parties.

C. Which State's Law Applies?

■ As set forth above, the billing statements issued by Card require payment to be made by defendant to a New York address. In fact, that document contains the following statement: "New York residents may contact the New York Banking Department to obtain a comparative listing of credit card rates, fees and grace periods by calling 1-800-518-8866." In spite of this language, which would lead a reasonable person to conclude that New York law would be applicable, the "Agreement," which plaintiff alleges binds defendant, states in bold letters at the end of the first paragraph that "[t]his Agreement is governed by Utah law and applicable federal law."

---

**2.** Mammy Yokum is a character from Al Capp's comic strip "Li'l Abner."

At no time has plaintiff provided the court with the applicable Utah law thereby requiring the court to undertake that task and investigate such issues as (1) the usury statute, (2) whether a contract can be formed or amended without the signature of the person to be charged, and (3) whether the contract may be amended without notice to the cardholder.

The Utah usury statute (Utah Code Ann § 15-1-1) provides:

> "Interest rates—Contracted rate—Legal rate.

> "(1) The parties to a lawful contract may agree upon any rate of interest for the loan or forbearance of any money, goods, or chose in action that is the subject of their contract.

> "(2) Unless the parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods or chose in action shall be 10% per annum."

The Utah statute for determination of interest rates (Utah Code Ann § 70C-1-106) provides:

> "For purposes of determining the interest rate allowed by the laws of this state . . . all finance charges, all fees charged for participation in a credit plan, whether assessed on an annual or other periodic basis, all transaction fees, all delinquency and deferral fees, all fees charged for exceeding a designated credit limit, all fees charged for return of a dishonored check . . . , all fees charged for stopping payment, and all other charges permitted under Section 70C-2-101 are considered to be interest under the laws of the state of Utah."

The Utah statute for determining delinquency charges (Utah Code Ann § 70C-2-102) provides:

> "(1) (a) The parties to any consumer credit agreement may contract for a delinquency charge on any installment not paid in full by its scheduled date in an amount not exceeding the greater of:

> "(i) $30; or

> "(ii) 5% of the delinquent unpaid amount of the installment.

> "(b) Notwithstanding Subsection (1) (a), in a contract, renewed, executed, or modified on or after May 3, 1999, a depository institution as defined in Section 7-1-103 may contract for and collect a delinquency charge on an installment not paid in full by

its scheduled due date in excess of the limitation imposed under Subsection (1) (a)."

The Utah statute controlling the change of terms of open-end consumer credit contracts (Utah Code Ann § 70C-4-102) provides:

"(2) (a) . . . a creditor may change any written term of an open-end consumer credit contract at any time while the open-end consumer credit contract is in effect and apply the new term to the unpaid balance in the account if:

"(i) the creditor mails or delivers written notice of the change . . . and

"(ii) the open-end consumer credit contract expressly provides that the creditor may change terms of the open-end consumer credit contract from time to time . . .

"(4) Notice under this section is not required when:

"(a) the change involves:

"(i) late payment charges;

"(ii) charges for documentary evidence;

"(iii) over-the-limit charges;

"(iv) a reduction of any component of a finance or other charge;

"(v) suspension of future credit privileges; or

"(vi) termination of an account or plan."

Is it any wonder that credit card issuers, such as plaintiff, make their agreements subject to Utah law? An interest rate is not usurious so long as the parties "agree upon any rate of interest" (Utah Code Ann § 15-1-1 [a]). It does not even appear that the agreement has to be written. If Damon Runyon's Nathan Detroit had known he could make loans charging 100% interest a day by reducing them to writing, and having them signed and subject to Utah law, he would not have had to seek a living running the "oldest, established, permanent floating crap game in New York."[3] The Utah law appears to limit the amount of delinquency charges a creditor may charge, but then exempts agreements made, renewed, executed or modified after May 3, 1999 from the application of the limitation. Utah law also

---

**3.** Nathan Detroit achieved fame as a character in the musical Guys and Dolls, which is based on two Damon Runyon stories, "The Idyll of Miss Sarah Brown" and "Blood Pressure." "The Oldest Established" is from Guys and Dolls (music and lyrics by Frank Loesser). Ironically, Runyon was born in Dorothy's home state of Kansas.

requires written notice of changes to the consumer credit contract but eliminates the need for any notice of a change of late, over-the-limit and other similar fees. Incredibly, courts are expected to enforce these agreements against unsophisticated, unrepresented consumers who reside in states such as New York which do not have similar statutes, and who have no idea that their agreement is subject to Utah law.

The above being said, what is the effect of these contract clauses and Utah statutes on an action commenced in New York? Is New York required to apply the Utah usury statute to credit card interest charges which far exceed the legal rate in New York? New York recognized the choice of law principle that contracting parties have by the terms of their agreement the right to choose the law to be applied to their contract. However, this freedom of choice is not absolute (*American Equities Group, Inc. v Ahava Dairy Prods. Corp.*, 2004 WL 870260, *7, 2004 US Dist LEXIS 6970, *18-19 [SD NY 2004]). New York follows the "substantial relationship" approach as set forth in the Restatement (Second) of Conflict of Laws. Section 187 (2) of that Restatement provides:

> "The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless either
>
> "(a) the chosen state has no substantial relationship to the parties . . . or
>
> "(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state . . . ."

As the court noted in *American Equities*

> " 'The New York Court of Appeals has addressed the "substantial relationship" approach and held that while the parties' choice of law is to be given "heavy weight," the law of the state with the "most significant contacts" is to be applied' . . . . 'New York law allows a court to disregard the parties' choice when the "most significant contacts" are in another state.' " (*American Equities*, 2004 WL 870260, *8, 2004 US Dist LEXIS 6970, *21-22 [citations omitted].)

The corporate plaintiff Travel is incorporated in New York and its principal place of business is in New York. Defendant resides in New York. Most of the transactions charged to the

credit card took place in New York. Payments on the credit card are mailed to a New York address. Presumably, defendant completed the application for the credit card in New York. The only contact with Utah is that plaintiff unilaterally assigned the agreement to what appears to be a related entity, American Express Centurion Bank, located in that state. Utah has no substantial relationship to the parties and New York has a materially greater interest in the application of its law. In fact, should plaintiff obtain a judgment in the New York courts, New York entities would be involved in enforcement of the judgment and its execution on defendant's New York assets.

The second prong set forth in the Restatement (Second) of Conflict of Laws also appears to be applicable in that New York has a strong public policy against interest rates which are excessive and this is a policy the courts must enforce (*North Am. Bank v Schulman*, 123 Misc 2d 516 [1984]).

"New York's present choice-of-law rule, dubbed the center of gravity approach is that the law of the State having the most significant contacts with the matter in dispute will be applied even where the matter in dispute is usury" (*American Equities*, 2004 WL 870260, *9, 2004 US Dist LEXIS 6970, *23-24).

The court in *American Equities* went on to analyze the New York "rule of validation" and concluded that New York has disapproved of that rule and does not apply it to usury cases (2004 WL 870260, *8, 2004 US Dist LEXIS 6970, *23, citing *A. Conner Gen. Contr. v Rols Capital Co.*, 145 AD2d 452 [1988]).

Taking all of the above into account, it is clear that New York has the most significant contacts to the parties and New York law will apply to the "Agreement" in reference to whether or not the interest being charged is usurious. It is obvious that in regard to a foreign state's usury statute, New York, like Dorothy, believes "[t]here's no place like home!"

The legal rate of interest in New York is "six per centum per annum unless a different rate is prescribed in section fourteen-a of the banking law" (General Obligations Law § 5-501 [1]). Banking Law § 14-a (1) provides: "The maximum rate of interest provided for in section 5-501 of the general obligations law shall be sixteen per centum per annum." New York still retains a criminal usury statute for interest rates which exceed 25% per annum (Penal Law § 190.40). Except for the initial interest rate charged on defendant's account by plaintiff of 12.24%, all other interest charges assessed by plaintiff violated the New York civil usury statutes. The last billings on this account in fact exceeded

the criminal usury rate of 25% when they reached 27.99%. The actual interest rate may in fact be higher because under Utah law all fees, including late fees, over-the-limit fees and the like are deemed to be interest (Utah Code Ann § 70C-1-106).[4]

Under New York law all usurious contracts are void and the agreement is unenforceable (General Obligations Law § 5-511) and the lender forfeits both principal and interest due on the transaction. That section grants an exception to savings banks, savings and loan associations and federal savings and loan associations so that the penalty for them is forfeiture of the interest only. Plaintiff is not one of these entities.

The Wizard in The Wizard of Oz warned Dorothy and friends, "Do not arouse the wrath of the great and powerful Oz." I am sure the court will likewise be arousing the wrath of the plaintiff by finding that the credit card agreement entered into by the defendant with any of the plaintiff's entities is void as in violation of New York's usury statute.

Conclusion

Plaintiff's cause of action is dismissed. The plaintiff is not the party to the agreement with the defendant and there is no proof of an assignment of the claim to plaintiff.

There is no proof that the agreement presented by plaintiff is the one which was in effect during the period of the transactions.

The cause of action is also dismissed on the ground that the interest rate is usurious under New York law making the underlying contract void.

Postdecision Note

The above being said, the defendant does admit having made several thousand dollars of purchases to his American Express credit card. To allow him to escape liability for those legitimate charges is not fair and equitable. Third-party merchants might find themselves unpaid by plaintiff under the terms of their agreements with American Express in the event of defendant's

---

4. Utah Code Annotated § 70C-1-106 refers to the interest rate *"allowed by the laws of this state"* (emphasis added) while Utah's criminal usury statute provides "[a] person is guilty of criminal usury when he knowingly engages in or directly or indirectly provides financing for the business of making loans at a higher rate of interest or consideration therefor than is *authorized by law"* (Utah Code Ann § 76-6-520 [emphasis added]). Because the criminal usury statute does not limit its language to Utah only, may it be concluded that Utah would have to apply New York's criminal usury statute to this transaction?

default. Further, if defendant is allowed to be relieved from paying for legitimate purchases for which he owes money, the loss will be spread by plaintiff to other cardholders in the form of higher interest rate charges or other fees. Enough people default on credit card obligations because of loss of employment, medical expenses, unforeseen personal events and matrimonial disputes so that the industry must build that expense into its course of doing business. Therefore, when a defendant can make payments and acknowledges the obligation for payments of the charges, a mutually agreeable payment plan should be entered into between the parties.

The court suggests that rather than plaintiff commencing a new action by the proper entity, the parties should attempt to resolve the litigation by entering into a stipulation. Plaintiff should recalculate the amount due as the actual charges incurred, eliminating all interest charges and fees incurred and crediting the defendant with payments made to date. The new balance should be repaid by the defendant without interest in equal monthly installments over a period of 60 months. In the event of a default, plaintiff will have to give defendant 10 days' written notice to bring the account current. If defendant fails to do so, then plaintiff may move to restore this matter to the calendar and seek to enter judgment for the balance due, with interest at the New York judgment rate, from the date of default.