*196 OPINION OF THE COURT
Michael A. Ciaffa, J.
Decision after Inquest
This otherwise routine inquest in a credit line debt case presents an important issue for creditors and prospective judgment debtors. What proof does a national bank need to submit in order to justify an award that includes interest charges far in excess of New York’s usury limits? The creditor in this case, a well-known national bank, seeks a judgment against defendant for unpaid balances that increased, monthly, upon the assessment of interest charges which accrued at an annual rate of up to 29.990%. Additionally, monthly “late fees” were added to the balances.
The monthly statements sent to defendant regarding his “CitiFlex Line” account advised him that the annual percentage rate of interest on the account could be increased if he failed to make certain required monthly payments toward his indebtedness. But there is nothing in the papers submitted that explains why Citibank should be entitled to a monetary judgment that includes interest rates and fees that significantly exceed New York’s criminal usury rate of 25% (Penal Law § 190.40), and which effectively double the permissible civil rate on loans and debts subject to New York law. (See Citibank [SD], N.A. v Mahmoud, 19 Misc 3d 1141[A], 2008 NY Slip Op 51091[U] [Civ Ct, Richmond County 2008].)
Are such otherwise “usurious” interest charges properly recoverable in a District Court proceeding brought by a national bank against a New York resident debtor? Lawyers for credit card issuers (such as Citibank) typically contend that national banks are exempt from our state’s usury limits under the provisions of federal law. Although the argument finds some support in the United States Supreme Court’s precedents (see Smiley v Citibank [South Dakota], N. A., 517 US 735 [1996]; Marquette Nat. Bank of Minneapolis v First of Omaha Service Corp., 439 US 299 [1978]), a national bank’s right to exceed this state’s usury limits is not established simply by alleging its status as a “national bank.” Instead, under applicable provisions of federal law, a greater showing is required. At a minimum, the bank must demonstrate, through proof in admissible form, that at least one significant nonministerial action associated with the account took place in the bank’s “home state.” Since Citibank’s papers fail to demonstrate its entitlement to an exemption from *197 New York’s usury laws, the court declines to award it judgment for those excessive interest charges and fees as were assessed against defendant’s account between January 2009, and the date this action was commenced in April 2009.
Facts Established upon Inquest
In this action by Citibank (SD) N.A. against defendant Jared K. Hansen for monies due under “a written credit agreement,” plaintiff submits an affidavit from an employee of an affiliated “debt collection operation” of Citibank alleging that defendant “applied for a line of credit, causing Citibank to open the account in question.” Defendant thereafter used the account to obtain “loans” for the purpose of obtaining goods or services or cash advances. Periodic written statements were provided to him, setting forth each transaction upon the account, together with “any finance charges imposed” along with “other charges that might apply.”
Following defendant’s failure to make payments on the account “according to the terms of the agreement,” Citibank claims it demanded for “the entire balance due and owing.” According to plaintiffs complaint, dated April 21, 2009, the balance owed as of that date was “$10,242.70, no part of which has been paid despite due demand therefor.”
On May 6, 2009, the instant action was filed, seeking payment of that balance, with interest. Defendant’s pro se answer included a defense that “[t]he agreement is unconscionable.” However, when the matter came up for trial, defendant defaulted and an inquest was directed. By virtue of that default, defendant’s liability is deemed established. But it leaves the court to determine plaintiffs damages, upon the documentary evidence in the record.
In support of plaintiffs claim for damages upon the inquest, it submitted documentary proof (see Uniform Rules for Dist Cts [22 NYCRR] § 212.32) which establishes that defendant owed $9,408.41 to Citibank as of January 2009. Prior to that date, defendant had been charged an annual percentage rate of under 10%, and had been making regular payments toward his debt.
Beginning in January 2009, however, Citibank’s statements began showing a significant increase in the annual percentage rate (APR), first to 25.990% and then to 29.990%. Such interest charges, plus monthly “late” fees, resulted in the issuance of a billing statement in March 2009 claiming a balance owed of $10,242.70.
*198 Legal Conclusions
Based upon the documents submitted, the court has no difficulty finding that plaintiff is entitled to recover damages in the principal amount of defendant’s indebtedness as shown on plaintiffs December 2008 statement ($9,408.41), with statutory interest (9%). However, the claim for much greater interest charges and late fees after that date presents a more difficult issue.
Plaintiff Citibank, as “a national banking association” (complaint If 1), possesses certain rights under federal law which may very well allow it to impose interest charges and fees in excess of our state’s limitations. (See Smiley v Citibank, supra; Marquette Nat. Bank v First of Omaha, supra.) But it would be wrong to assume that its right to do so is completely unfettered. (Cf. American Express Travel Related Servs. Co., Inc. v Assih, 26 Misc 3d 1016 [Civ Ct, Richmond County 2009].)
More than four years ago, in Citibank (S.D.), N.A. v Martin (11 Misc 3d 219 [Civ Ct, NY County 2005]), in the context of a summary judgment motion, Citibank was advised, in explicit terms, that it should provide relevant information to the court “refuting application of local usury laws” to assure that a damage award is “not excessive in amount.” (11 Misc 3d at 221-223.) The court’s concerns in that decision were echoed several years later in another Citibank case. (See Citibank [SD], N.A. v Mahmoud, supra.) In a more recent decision by Judge Straniere, he again pointedly raised issues respecting a credit card issuer’s entitlement to the benefit of a federal statutory exemption. (See American Express v Assih, supra.)
Judge Straniere’s decision in Assih analyzed the issue, in large part, under conflict of laws principles. It remains to be seen whether he was correct in doing so. Nevertheless, his decision prompted me to look closely at the applicable provisions of federal law. What I found, on close examination, was that federal law was not nearly as clear as many courts have assumed.
As I read federal law, as interpreted by federal regulatory authorities, an interstate national bank (such as Citibank [SD] N.A.) may charge interest and penalties permitted by its “home state” (e.g. South Dakota) only if at least one significant non-ministerial function associated with the account actually took place in the bank’s “home state.” (See Comptroller of Currency Interpretive Letter No. 822 [Mar. 1998] [interpreting 12 USC § 85]; see also 1998 Ops FDIC Gen Counsel No. 11 [“Interest Charges by Interstate State Banks”].) Under this analysis, the *199 legality of a national bank’s decision to charge “home state” interest rates hinges on whether it actually conducts certain important nonministerial functions in its home office. (See MorEquity, Inc. v Naeem, 118 F Supp 2d 885, 897-898 [ND Ill 2000].) Although such a structuring of bank functions may be done “deliberately” in order to invoke the more favorable usury laws of certain states (see testimony of Randall S. James, Texas Banking Commissioner, before House Financial Institutions Committee, June 16, 2004, at 11), the location of nonministerial functions must actually be shifted to the bank’s home office to take advantage of the exception.
The Comptroller of Currency explicitly adopted this distinction in Interpretive Letter No. 822 (supra). As recognized in Smiley v Citibank (supra), interpretations of federal law by the Comptroller of Currency are ordinarily treated with deference. “[T]he question ... is not whether it represents the best interpretation of the statute, but whether it represents a reasonable one.” (517 US at 744-745.)
The Interpretive Letter in question was issued in response to an inquiry “asking when an interstate national bank (a national bank with its main office in one state, the home state, and a branch in another state, the host state), may charge home state interest rates on its loans” (Interpretive Letter at 1). The Comptroller of Currency began its discussion by quoting the cryptic language of 12 USC § 85. “Under 12 U.S.C. § 85, national banks may charge interest in accordance with the laws of the state in which they are ‘located.’ ” (Id.) As applied to banks with multiple offices, however, section 85 did not clearly answer “when the National bank should look to the laws of its home state and when it should look to the laws of a host state to determine the rates that it may permissibly charge with respect to its lending activities.” (Id.)
Through a thorough review of “relevant statutory provisions, case law and legislative history” (id.), the Comptroller of Currency issued a series of interpretive findings which underscored the difficulty in giving a definitive answer to the question. First and foremost, the Interpretive Letter concluded that a national bank “may be ‘located’ for purposes of section 85 in both its home state and its host state or states.” (Id. at 3.) “As a result, the issue that arises is when a national bank should apply the usury laws of its home state, and when it should apply the usury laws of a host state, to a loan. This analysis requires a consideration of relevant statutory provisions and legislative intent.” (Id.)
*200 Second, the Comptroller of Currency concluded that Congress had not completely foreclosed application of a host state’s usury laws to a national bank’s lending and credit activities. Although a national bank’s right to charge home state rates “is not defeated simply because a bank has a branch in the state where the borrower resides,” the host state’s laws and rules would continue to apply when the host state’s branch office was the one actually “making the loan.” (Id. at 7.)
Importantly, the Comptroller found compelling evidence in the federal legislative history which supported its interpretation. As Senator Roth (R-Del) stated in the Congressional Record: if a national bank with a home office in State A “approves a loan, extends the credit, and disburses the proceeds” to persons or entities in State B, it “may apply the law of State A even if the bank has a branch or agent in State B and even if that branch or agent performed some ministerial functions such as providing credit card or loan applications or receiving payments.” (Interpretive Letter No. 822 at 8-9, quoting statement of Senator Roth in support of the “usury savings clause” of the Riegle-Neal Interstate Banking and Branching Efficiency Act [Pub L 103-328, 108 US Stat 2388, codified at 12 USC § 1811 Note], 140 Cong Rec S12785, S12790 [Sept. 13, 1994].) Conversely, “if a branch or branches in a particular host state approves the loan, extends the credit, and disburses the proceeds to a customer, Congress contemplated application of the usury laws of that state” irrespective of whether the home state’s laws allowed for higher or different rates. (Interpretive Letter No. 822, at 9.)
The relevant Supreme Court precedents, read carefully, are consistent with this analysis. The decision in Marquette Nat. Bank v First of Omaha was made upon a record which included a showing by a Nebraska bank that its home office in Nebraska was responsible for all nonministerial actions associated with the account. (439 US at 310-312 n 24.) Since the bank’s offices and nonministerial functions were all located in Nebraska, the Court concluded that the bank could not be deprived of the legal benefits associated with its location in Nebraska, including that state’s favorable usury laws, “merely because it is extending credit to residents of a foreign state.” (Id. at 310.) For similar reasons, the mere fact that the bank honored transactions with Minnesota merchants was not “determinative of the bank’s location for purposes of [section] 85.” (Id. at 312.) But in so concluding, the Court took pains to distinguish situations where “participating Minnesota banks” were, themselves, extending credit to Minnesota residents through nonministerial actions in *201 that state, in contravention of applicable Minnesota law. {Id. at 311-312 n 24.)
The Court’s more recent decision in Watters v Wachovia Bank, N. A. (550 US 1 [2007]), in turn, draws a material distinction between the power of a national bank to act through “operating subsidiaries” and the acts undertaken by its “affiliates.” When a national bank acts through its “operating subsidiaries” it may do so under the same terms and conditions applicable to the bank itself. In contrast, the acts of “affiliates” located in other states remain subject to the other state’s regulation.
Moreover, as recognized in Watters, “state usury laws” continue to “govern the maximum rate of interest national banks can charge on loans.” Watters v Wachovia Bank, N. A., 550 US at 11.) The key issue, in all cases, is whether the non-ministerial actions of the bank and/or its affiliates, undertaken in connection with a given account, actually took place in one state or another. Inherently, this is a fact-sensitive question. (Cf. SPGGC, LLC v Blumenthal, 505 F3d 183, 191 [2d Cir 2007] [seller of prepaid gift cards issued by national bank held subject to Connecticut Gift Card Law in the absence of proof that “the fees in question (were) established and collected by the issuing bank rather than by (the seller)”].)
In the instant case, Citibank’s ability to lawfully charge interest rates and late fees to defendant’s account, in amounts in excess of those permitted by New York law, rests upon the premise that 12 USC § 85 gives it the right to do so. Section 85, on its face, governs the rate of interest that may be charged by a national bank “on any loan ... or other evidences of debt,” and it is well settled that the providing of money through a credit card or similar credit line account constitutes a “loan” within the meaning of section 85. (See 44B Am Jur 2d, Interest and Usury § 126.) Accordingly, the court does not question Citibank’s right, consistent with federal law, to structure its credit line and credit card affairs in a manner that enables it to avoid and circumvent the usury limits of this state.
However, the issue presented, here, is whether Citibank has, indeed, so structured its affairs. The court shares the concerns expressed by several of my fellow judges as to whether national banks and other credit card issuers have been literally following the letter of the law, or have been abusing it for their enrichment at the expense of our state’s citizens. (See American Express v Assih, supra; Citibank v Martin, supra.)
In other matters heard by this and other courts, creditors have sought judgments that have included interest charges that *202 sometimes have exceeded 50%. The interest charges, in this matter, were assessed at a rate of up to 29.990%. Although apparently customary in today’s marketplace, the rates grossly exceed New York State limitations. (See American Express v Assih, supra.)
Based upon the papers submitted by Citibank, it is unclear, to say the least, whether plaintiff could legally apply a 29.990% APR to defendant’s account, and then add additional monthly late fees, after he ceased making payments on the indebtedness. Apart from a general warning in plaintiffs billing statements that the APR “may increase” in certain circumstances, the court has not been presented with any other evidence respecting the terms and conditions of the line of credit agreement, and accordingly has no way of knowing whether the increased APR was or was not authorized by the agreement, as written.
Nor is it clear, from the papers submitted, whether “Citibank (SD) N.A.” maintained any meaningful role in handling the subject account after it was opened. As far as the court can tell from plaintiffs evidence, the national bank’s corporate parent, Citigroup, arranged for Ohio affiliates to manage the account. The billing statements all call for payments addressed to “Citi” using a post office box in Columbus, Ohio. Moreover, records of payments made by defendant show they were credited by “Citigroup” to a “Citibank” account in Ohio. Notably, the usury laws of Ohio, like the laws of New York, contain criminal usury limits that were apparently exceeded in this case. (See Ohio Rev Code Ann §§ 2905.21-2905.24.)
Most importantly, no proof is submitted upon inquest addressing the criteria set forth in Interpretive Letter No. 822. What nonministerial acts were performed by Citibank from its “home state” offices in South Dakota? What nonministerial actions were performed by affiliated entities from locations in other states? Citibank’s papers do not say. (Compare Comptroller of Currency Interpretive Letter No. 776 at 2 [Apr. 1997] [concluding that a bank’s “home state” usury laws govern its credit card agreements nationwide, where the bank claimed that it “conducts virtually all of its credit card operations in and from its main office state”].) Nor does the complaint include sufficient factual allegations to warrant such findings upon the defendant’s default in appearing at trial.
Accordingly, based upon such failure of proof, the court declines to grant such part of plaintiffs claim as seeks to impose interest charges and late fees upon the unpaid balance which *203 existed as of the January 2009 payment due date ($9,408.41). Absent a showing that plaintiff was entitled to apply interest charges and late fees in excess of those allowed by New York law (see American Express Travel Related Servs., Co., Inc. v Assih, supra), the court limits its award to $9,408.41, plus statutory interest from the due date of payment in that amount (January 16, 2009).
Plaintiff may submit judgment, on notice, for the latter amount only, with interest at 9% from January 16, 2009.